325-0320 RSCK Holdings, LLC Appellant v. City of Elmhurst Appellee Mr. Day, if you're ready to proceed. Thank you very much, Your Honor. Count 1 is the focus of our appeal in this particular case. This is a classic LaSalle and Sinclair pipeline factor case. 100% of the material facts were undisputed by the parties. 100% of the facts are made up of the public record of the City of Elmhurst because they are a public record institution that's available to virtually anybody. The sole restriction challenge, which is the denial of a right to construct a building between 77 feet tall and 125 feet tall in height where the City permits such buildings by a and 4, Resolution Account 1 was ready and qualified for summary judgment and was the subject of cross motions for summary judgment between the parties. I'd like to explain and summarize briefly for the Court exactly what it is that the City denied. The proposal from RSCK incorporated demolition of two dilapidated, non-code compliant buildings that were the subject of deleterious platting. And that demolition was to be followed by redevelopment of the property with exactly the luxury mixed-use condominiums over retail parking structure that the City 2016 Downtown Plan and the 2018 TIP Redevelopment Plan said would benefit the public welfare of the City. It would infuse residents into downtown to stimulate business and would eradicate blight. Further, the RSCK proposal contemplated the development at the very York Street location where the 2016 Downtown Plan called for the tallest buildings and the highest intensity of development to occur. The York Street property was also a location that the City had specifically identified as an underutilized redevelopment opportunity and also as what is called a catalyst site by the City on which redevelopment in the future would benefit the downtown and would also encourage other reinvestment into other downtown surrounding properties in need of  Further, the proposed RSCK project would deliver a 35 to 1 increase in the equalized assessed value at this particular location. And the 2018 TIP Redevelopment Plan expressly stated that the lagging equalized assessed value within downtown was one of the key problems that the City needed to overcome in order to generate adequate revenue for the City government as well as for other local taxing institutions. The RSCK proposal also included a fully code compliant luxury Lucien Lagrange designed architecture with masonry, steel and glass building that was expressly called out for the type of development the City wanted to see in terms of their downtown plan design guidelines. Further, RSCK proposed a 28 to 2 increase in residential living units to provide the much needed infusion of residential density of people living immediately within the densest location in the entire City in order to stimulate businesses, a population that could service the business and create demand for other commercial properties in the downtown area. That was specifically called out in the 2016 downtown plan. Mr. Day, aren't we really specifically talking about the height of this building? I think everybody would agree that those goals would be met, but that the opposition would argue that they'd be met by a 77 foot building and we don't need to go any higher. That issue was never litigated, Your Honor. And our position was that the denial of this particular condition used for height and the City did it deprived us of all economically viable use of the property. We went through the analysis that is in your record that S.B. Friedman ran and they told you in very clear detail that if you eliminate just a portion of the top floor, it's going to cost in excess of a million dollars in the profitability and revenue of this particular project. Doesn't that presuppose that you maintain the density that was originally contemplated, but you could increase the density per floor and that might impact the profits? Does that matter? Because density, I understand, was a reason as well for the denial. The issue that I can respond to at this point, and I will speak to the density, Your Honor. The issue that I can speak to is that you have the economic analysis that was done by RSCK and submitted to the City, and it tells you with unequivocal clarity that if you remove one floor of development from this property, you are in excess of close to $2 million in losses in revenue, and the City didn't remove one. The City removed three. They chopped this thing down to 77 feet with a chainsaw, and they didn't alter the plan in any way, shape, or form. You now have a mere 16 units of condominiums that the City has essentially approved at this location. You still have parking for 28 units. That's what the City did. So the economic impact of denial of a conditional use for height at this particular location was devastating to this particular project for this applicant, and we told the City that in writing through the expertise and opinion that was submitted by S.B. Friedman. We think that they're a very influential and very well-established firm. Going further, we actually proposed three different alternatives to the City, and we of how we would adjust the height of the building and the massing of the building. The City directed us to study setting back the top floor of this particular property so that when you were looking up from the street, it would look like a shorter structure. We did that. The City also said, why don't you try considering lopping off an entire floor of the property, and we did that, and we showed them what that would do to the economic return on the property but said that we could do both of those particular projects. That was in the S.B. Friedman report. That was the analysis that we did go through, and that was done specifically for balancing the relationship between massing and height. We proposed a project that would generate between $8 million and $10 million in TIF incremental revenue that would be paid to the City for constructing new infrastructure and incentivizing other developers to redevelop within the downtown Elmhurst area. Now, with that in mind, then you have to look at the reason that the City gave for denial of this project, and under the LaSalle and Sinclair factors, you would have to balance what the City gained by denying this particular project against what it is that the property owner lost from an economic standpoint. That's specifically within the LaSalle factors themselves. So the City's rejection of the conditional use for height was essentially, you're not going to get a conditional use, and you can't do anything on this parcel of property other than develop a site at 77 feet. That's what the City did in this particular case. They said 77 feet, that's all. And they said, number one, if you build a structure that allowed the property to go within the 77 to 125 feet, that's any of the three that we proposed in height, it would simply be, quote, too tall, or it would be, quote, out of scale with the surrounding properties and would block air, light, and would cast shadows on other CBC court properties. That's the basis for the denial. They went on to say that the building, if they were to give us a conditional use building within that 77 to 120 foot height, it would not foster other development at this location, but rather would impede redevelopment. Now, remember, the comprehensive plan of the City said that we were building on a site where redevelopment of this parcel would foster redevelopment, and now the reason for denial is that if we build the project, it wouldn't foster redevelopment. Third, the 28-unit density proposed was an insufficient density to increase the project. Now, I want you to think about that, because we had a 109-foot tall building that was going to generate 28 units of condominiums, and when you cut this thing down to 77 feet, in the name of increasing the density and preserving a greater density at this location, they're going from 28 units down to 16. And despite the fact that that might be referred to as modern math, that's a pretty significant reduction that they made to this particular project. The greater the density, the better the project from the City's standpoint, and they just reduced this project from 28 units to 16 in the name of protecting the public welfare. We think that that is one of the most ridiculous arguments that they made in this particular situation. Lastly, and this is the one that I think is most glaring, is they asserted that the proposed use that we came up with was inconsistent with the 2016 Downtown Plan. Now, those particular issues then were denied by the City, and the legislative land-use decision-making was in effect a prayer, according to the trial court, for us to second-guess the City's denial. Those reasons were the reasons that they denied them. This case is not a request that the court second-guess the decision of the City. This is a case where the court assessed whether or not the denial and the reasons that the City gave had a direct and substantial relationship to protection of the public welfare. And the means by which you have to go about doing that, with a conditional use, first and foremost, you have to apply the Sinclair and LaSalle factors in order to evaluate whether or not the denial was rational or whether or not it had no substantial and direct connection to protection of the public welfare. That's what this case is about. Secondarily, this is only a conditional use, and the Supreme Court has basically held in the living word decision that this particular nature of an entitlement, a conditional use, this is unlike any other zoning decision. It is not a variance. It is not a text amendment. It is not a map amendment. You are not asking the City to change its zoning in any way. You are asking the City to grant you a conditional use because the City has permitted conditional uses, and the Supreme Court says the very act of permitting a conditional use at this is a legislative decision that the use itself is in harmony with the downtown area. But that presupposes, I mean, you can't say that just because there is a conditional use is permitted, it must be approved in every single instance. That's why we have review. That's why we have site-specific consideration by the City. When I look at living word, I mean, you had essentially a prohibition of any non-economic building here at Church. We don't have that here. We know that there are taller structures that have been approved by the City, so there isn't a, we don't have a situation where it's just some outright prohibition of any building in excess of 77 feet. So how do you answer the suggestion that, look, this denial was site-specific. It wasn't some blanket prohibition, which was ultimately, I think, the concern in living word. How do I answer that, Your Honor? Is that the question? Okay. My answer is this. The act of permitting conditional use development at this location up to 125 feet, the Supreme Court has expressly said that is a legislative finding of the City, and the City can't contradict its legislative finding. Part two, the Supreme Court in living word expressly said, as soon as you do that, there are certain things that you cannot use as a basis for denial. There are certain things that are irrational for you to use as a basis for denial. First, any attribute of a structure that juts into the 77 feet up to 125 feet airspace, every single one of those structures, no matter where they're approved, is going to interfere with light, air, and will cast shadows. And the Supreme Court expressly said that can't be a basis for denial of the conditional use. And from a logical standpoint, to say that that could be a basis would essentially eviscerate the conditional use itself. If every building is going to interfere with light, air, and cast shadows in this area, then every single parcel of property that had such a building would be in violation to the public welfare. You could never, ever approve a building that wouldn't cast shadows and interfere with light and air. So virtually every building of any kind would be in violation of the public welfare. That essentially amends the code to write the conditional use right out of the code. That's why- What about the failure to balance height and mass? That was another concern that the city expressed. It's interesting that the city expressed an interest in failure to balance the height and mass of this particular property, when at great expense in excess of $300,000, we went through and did the evaluation of all three different elevations that the city itself directed us to evaluate. And we told them that we could alter the height and mass of the structure in certain circumstances, but the city didn't bother to even evaluate those. They never gave deliberation to the full application that we submitted for the conditional use. We told them we could actually develop any one of the three proposals that we have before at differing heights and different massing operations. And the city just refused to do it. We even told them that they'd only reviewed the one application and they went ahead and did it anyway. So all I can tell you is balancing height and mass, you also have to look at the property that the city already approved. Anytime you're dealing with the rational application of the police- Are you referring to the Flynn or some other building? I'm referring specifically to the Fenn. I am. Well, if I look at my understanding, and again, the record's not very- Well, let me just say this. My understanding is that the property that the Flynn was developed on is three times the width of this property. Is that correct? Well, it depends on where you're talking about. It's three times the width of this parcel and occupies a much larger mass. It is jutting into the exact same 77 to 125-foot airspace. And when they approved the Fenn, that Fenn property is 60 feet away from our property. At the time they approved the Fenn, it was now casting shadows on our two-story parcel property, and that was just fine to the city. And all of the properties that are immediately to the south of our parcel of property directly on York Street, all of those properties are one and two-story buildings as well. And the Fenn was basically eviscerating the sunlight at 92 feet immediately across the alley from those parcels of property, and that was just fine to the city. So essentially, what the city did is they said, you know, the Fenn, that's perfectly fine. It's a big structure. It's 92 feet. That's perfectly fine. We don't care if it's casting shadows or light or it's interfering with the air. It's three times the size of ours. It's interfering with a lot more air than ours. And we're talking about the same property. You're talking about the impact of a conditional use at an identical location on identical neighboring parcels of property. And one of them, the city said, you know what? It's perfectly fine. Don't worry about it. And ours, oh, my goodness. Council, I realize you're answering a question here, but you're becoming a little bit cumulative in your answer, and your time is up. Any questions before we turn it over to Mr. Holmes? Well, thank you. Not at this time. All right. Mr. Holmes. Well, I'd like to begin just kind of where Attorney Day left off and talk a little bit about the Fenn and comparing it to this structure. I'd point out the Fenn was approved prior to the PD amendments that were made in 2019. It was actually approved a week after, two weeks after, but the application came in, so it didn't have to apply for a planned unit development. It was just a conditional use for height at the time. The conditional use for height, we learned a lot, honestly, from the Fenn development. It's on a much larger lot. It's three times as wide, and it's 20 feet lower than the proposed structure proposed in this case. One of the things that I would note is that residential density, which you guys addressed with your honors, addressed briefly a little while ago, the RSCK development was 28 units proposed. The Fenn development has 212 units. The average size, the size of units in the RSCK development range from 2,400 to 2,670 square feet for condos. The smallest units in the Fenn are 565 square feet. But if I could ask, in approving the 77-foot plan with 16, you didn't pare down the size of the units at all. No. Why isn't that just a specious argument? Well, the idea would be to justify the extra height for the thing would need to have some type of additional issue. Not to be addressing and saying it's specious, but we also have the other related matters that were the other six reasons that this project was denied. One of them is the open space. I don't know if your honors went online. You might have Googled what the Fenn looks like. That would be outside the record. Yeah, right? There you go. Mr. Holmes, I just want you to answer Justice Bertani's question. I understood his question to be, you didn't suggest to RSCK that you increase the density per floor. You just cut the number of floors, but you didn't make a suggestion in that regard. Is that correct? If that's the case, that I believe was Justice Bertani's question. It seems a little specious to say you were worried about density. No. Repeatedly throughout the hearing process of this, and you can review the transcripts of the hearings, the various commissioners at the planned commission and the city council expressed concern over the size of the units in the RSCK development. But that discussion is great, but that's not reflected in the ordinance, is it? The ordinance actually does say at the end of the, I believe the fifth one here, it says the commission discussed the density of the project and did not believe that large unit sizes meet the intent of increasing residential density downtown. And then they made the opposite finding in approving the 77 footer. Well, the 77 foot project was subject to a different size. With regard to unit size, it was all part of the same project. They had met the standards for the planned development with respect to this. They didn't meet it in the judgment of the planned commission and the city council with respect to the higher building. Okay. Yeah. Go ahead, Mr. Holmes. Continue. All right. So comparing the Finn to the RSCK development is apples and oranges. The open space and pool that are on the second floor of this building carves out the interior space, creating a giant open public space on the second story of the Finn development. That's why I asked if you had seen it. Not like it's a big rectangle that sticks up out of the ground. Relative wise, we actually learned a lot from this and the impact of the light as noted by Mr. Day is one of the reasons that this became such an issue with this when it went to the planned commission. Is the existing problems created by the Finn development with respect to light in the area are one of the things that became a pretty, there was a pretty passionate crowd at the hearings with respect to this regarding the impact that the existing larger structures had had on adjacent properties. I would point out also that the Finn sits on Addison Street, which has a five story apartment building, a six story apartment building, a parking area located directly next to it. Whereas York Street, the tallest structure is two stories up and down. Um, the properties on either side of this site are two stories and there's essentially zero setback on either side of the building. So this would be a two story building, butting directly up to a nine story building as approved. I would also address the fact that the continued argument that three proposals were made. What the, the plan commission did was review the application as submitted by the appellant. If you go back to the record and look at what was submitted, there was one plan submitted and two plans were discussed in the SB Friedman report and with additional plans were submitted later on. The decision was made with respect to the application as submitted at the time of its application. This, you know, wasn't an easy decision for them. I don't believe any of this was unanimous with respect to the plan commission, but eventually it made it to the city council. They agreed with the findings of the plan commission with respect to the conditions for conditional use. Briefly, the standard as, as discussed by Mr. Day is, is rational basis for review of this. It's a very deferential standard. He's referring to Los Alamos and Claire factors, which we do consider as they've been incorporated. They are the basis for the standards for a conditional use in the city of Elmhurst zoning code. It's the same thing with respect to amendments and variations. There's some slight differences in the standards, but those are incorporated. Most municipalities at this point have incorporated LaSalle St. Clair into the zoning codes and to one extent or another. The rational basis test basically says if the decision of the village to approve or deny a zoning decision is a rational way to achieve a proper purpose. That the decisions of the unit of local government will be upheld by the court. And I believe that the circuit court properly upheld the decision of the Elmhurst city council, relying upon the reports of the Elmhurst plan commission in this case. I'm not sure because I don't feel like we addressed counts two, three, or four, or the other issues in this case. I'd be happy to, but I'm afraid I'm going to run out of time pretty quickly here. So if there's other questions regarding count one before I move on, please, please have at it. I'm more than happy to answer them. Well, you just talked about the rational basis test for an appropriate proper purpose. Does that proper purpose have to be consistent with the existing zoning ordinance? It in this case, yes, but it is well to an extent. So because the city of Elmhurst is a home rule unit of local government, it can by implication modify its own zoning code to the extent that that modification doesn't conflict with constitutional or statutory requirements that preempt home rule authority. That would be the landmark case, which I'm sure you guys are familiar with. The basically the city of Elmhurst, I think one of the main issues and why this case is continuing on is that there's a misunderstanding of planning documents. The comprehensive plan is an advisory document. The city of Elmhurst isn't required to follow it, as is the TIF redevelopment plan. These are things that, you know, they're speculative in nature when they're adopted by units of local government. And there's never been a case in Illinois where municipalities are required to follow what's in their comprehensive plan. In fact, living word, the case that Mr. Day is asserting in this instance specifically calls that out and says that a comprehensive plan is a plan. It is not a zoning ordinance. Yeah, but that was the opposite. That was the opposite. Where in the comprehensive, the zoning ordinance said one thing and the comprehensive plan that was adopted later said another.  It was a complete opposite of what's happening in this circumstance, which is that in that case, it was held that the comprehensive plan can't, by inference, amend the zoning code. In this case, they're suggesting that our zoning code comply with the comprehensive plan, which is not. Suggesting that it inform what the legislative action should be rather than a mandate. I mean, they're aware of the comprehensive plan. It was adopted not that long before this. This is one where, in the judgment of the Planning Commission and the City Council, this just didn't meet the standard. I have one more, and sorry about that. Please, yeah. You talked about the one and two story buildings on either side with no setbacks. Your ordinance doesn't require side yards, correct? No, it does not, no. So the approved plan also has no side. That is correct, and it's still very big, yeah. Thank you. Anything else on count one? I don't believe so, Mr. Hall. Sir, briefly talking, because I'm going to run out of time pretty quick here. Briefly talking about count two and count three. Count two was appropriately, summary judgment was appropriately granted on count two at the Circuit Court. The motion for summary judgment, in my opinion, probably should have been a 2-6-15 motion to dismiss. I had followed the direction of Judge Belford in that he wanted this to proceed to motions for summary judgment instead of just endless 2-6-15s with respect to it. The issue with count two is that there's nothing in the code that suggests that there is invalid in its entirety and in all applications. I think that it's clear that we have successfully used this to develop the downtown, and we've had several cases go forward that have no problems like these. With respect to count three, it seems to me, based on the complaint, and it seemed to Judge Belford, that it seems the only real complaint that the plaintiffs have is that they had to comply with our zoning code to apply for a conditional use. The conditional use is for... And to apply for a PUD, did they not? Both. It's actually a conditional use for PUD and a conditional use for height. They're two separate things as required by our code. All right. There's actually also a variance that they required for front yard setback, but it was only... I mean, it was two feet, and it was granted. So, with respect to their complaints about the as-applied challenge, I would point out that it's almost expressly focused on their compliance with the 2019 plan development ordinance. Their plan development was approved. What wasn't approved was a conditional use that they would have had to apply for even in the absence of the plan development. The PD ordinance and their compliance with it, they were granted the plan development. They were granted the variance. The only thing that wasn't complied with was the standards for conditional use for height, which would have been in place even in 2018, 2019, before the plan development ordinances went into effect. And with respect to count four, that's the taking. Frankly, I don't believe that anything they've alleged constitutes a taking, specifically in the context of zoning cases. The cases cited by the appellant in this case deal with physical takings. Specifically, I think they're Hampton and Reitner, I think of the two, both of which, one of them, stormwater detention, expanded onto a subject property, and they were entitled to recompense based on the area, percentage area that was actually physically taken. And the other case is an 1880s case where a viaduct closed off entrance to a apartment complex. So I don't think that anything in that meets the standard that's current, which is a total deprivation of economic benefit. The property was purchased for $1.3 million and pursuant to their complaint, as approved, is worth almost $8 million. The final thing that was in the appeal, the final matter under appeal was whether or not the original motion to dismiss should have been granted. I would point out, and as I did in my brief, I think that was actually more of a sua sponte dismissal for procedural issues or form issues with respect to the initial pleading. My motion to dismiss was substantive, based on the actual arguments made by the appellant. But what was, I actually had filed a motion to strike about 30 paragraphs of the complaint, and rather than go through all 30 of the paragraphs I wanted stricken, the judge dismissed the complaint with direction to replead, removing the offending legal conclusions. Otherwise, Your Honors, thank you very much for your time. If you have any questions, I'm happy to answer. Gentlemen, any other questions? Hopefully a quick one. Count three, the PUD. I think their objection is, at least their complaint objects that they even had to comply with that and that it should apply to them. I mean, isn't a PUD normally where a developer seeks variances from the strict setbacks or size of, that are set forth in the permitted uses in order to make a more cohesive and a better planned out community? For example, instead of having a certain lot size, allow smaller lot sizes in a smaller portion of the area and allow open space for the public. Isn't that what normally the PUD is? So, sometimes. So the reason, and I'm sorry that I'm over time, but I'll answer your question. No, go ahead, answer the question. So, the PUD in this circumstance is because this is part of our downtown corridor and there's a 75-foot limit. Anything over that becomes this, because that would implicate that multiple lots are being utilized. This project didn't require to be a PUD if it was two different projects on two 40-foot lots. That's not what this was, though. This is consolidating lots. The 75-foot limitation on this is to ensure, honestly, flexibility with respect to how the developments would move forward in this part of town, as the intent was to have a number of mixed-use developments in this part of the world. And when you have a planned development, what it does is it's twofold. It allows you to have greater flexibility with respect to the use and design of the structure, but it also allows the municipality to address more design elements with respect to the, essentially, the elevations of the project. So, in this case, it wasn't what a typical PUD would be, but the reason set forth in the ordinance to approve the planned development, and frankly, I was not a part of the decision making with respect to the PUD ordinance. However, I would point out that it happened around the same time as the fin development was happening, and there were a lot of disputes regarding the approval of that project. Thank you, sir. No problem. Thank you. Mr. Brennan, anything? No, not at this time. Thank you. Mr. Day, rebuttal. Okay. Several things that I need to correct on the record. Number one, our application absolutely includes all three opportunities. We've actually included that in our brief on appeal. We gave you the page directly out of our application, and all three different iterations were proposed by this client. Number two, he indicated that the fin is 20 feet lower than all of our projects. That's simply false. We had three different iterations of the height. One of them was six feet taller than the fin. Six feet, not 20. Third, they indicated that somehow or other the planned unit development and the conditional use for height are the same application. That's false. They're not. They're two completely different conditional uses. They have two completely different standards. They are not related in any way, shape, or form. They were written as different applications, and they were deliberated as different applications. Don't conflate the two of them and mix the two of them up. That's one of the things that the plan commission did when we went through the hearing. Third, he's wrong indicating that we requested a variance. We did not. It is undisputed in the facts before this particular court that we told the city with unequivocal clarity. We needed no variances, no relief from the city in any way, shape, or form. We told them, if you want landscaping on this project, because you tell us that you want landscaping on your streetscape, if you want landscaping, you're forcing us to build lot line to lot line. This is the crazy ordinance that the city's got. You can't build it small. You must build it large. So you have to occupy the entire property. And when the FIN went and processed that, they begged the city for a variation, which the city gave them, because they said, we can't economically develop this property unless you give us that variation. And the city concurred. They gave them a variation from the stuff that we have to comply with on this project. Taking versus regulatory, you need to understand, on counts two, three, and four, the court already ruled that they stated a cause of action under 2615. That's the law of the case. They filed a motion for summary judgment, having denied virtually all of the allegations for counts two, three, and four. So every one of the factual allegations for count two, three, and four were in dispute. And the court anyway just said, yeah, I'm going to go ahead and grant summary judgment, despite the fact that I already ruled these things, plead facts, which stated cause of action, and they've denied all the facts. That's not proper. And lastly, as it relates to the issue, he's indicated that somehow or other, our property is worth $8 million for the 77-foot plant. Please ask him to show you where in the entire multi-thousand page record of this case, there's an indication that our property has a value of $8 million with the 77-foot plant. That doesn't exist. Our allegation to the city was that the city has denied all economically viable use of this project, and the city denied that allegation. That's why, as it relates to counts two, three, and four, that wasn't ready for summary judgment. All of the facts were in dispute, and the court had already ruled that all of the facts that we pleaded stated a cause of action. So for that to go to summary judgment reflects a trial court that is not paying attention to its own decisions and the law of the case in this regard. This is one of the situations where the fundamental issue before the court is whether or not there is a direct and substantial relationship between the denial of this conditional use for height and the public welfare. That has to be analyzed pursuant to LaSalle and Sinclair. The Sinclair Pipeline Company said, you know, you really got to look at the way they planned downtown and what they said about your parcel of property. If you do that, this isn't even a close case. This is the clearest, fundamental, as applied substantive due process violation I've seen in my 45 years as an attorney. I've never seen anything close to this. And if you read the 10 decisions that make up the LaSalle basis in their analysis, you will see that that is almost ethereal compared to the documentation that we have. The city said they wanted us to do exactly what we proposed at this location, and the city said we're not going to enforce this concept or this prejudice that all tall buildings are bad because they'll be next to two-story buildings. They said exactly the opposite. We want to get rid of the two-story buildings, and we want to build tall buildings. And RSCK, if you go ahead and build a tall building at this location and put millions of dollars into condominiums at this site and build up our EAV and our tax revenues, we're not going to turn it down just because you're going to be taller than the neighboring property. And that's exactly what they did. They got us to the end of this particular project, and then they turned right around and said, you're going to cast shadows and all the rest of this, and we can't have you towering over the property so that we literally want to eradicate. They want to get rid of the one- and two-story buildings on York Street, and what they're doing is they're preserving them in the name of preventing us to give them 28 units of condominiums at a location where they said they were good. Thank you, Mr. Day. Justices, anything else? No, thank you. No, thank you. Thank you, gentlemen. Thank you very much for your spirited arguments, to borrow one of my colleagues' terms. We will take this matter under advisement and issue a ruling in due course.